21-0830, *Robert D. Toler v. Cornerstone Hospital of Huntington, LLC*

**FILED**
**June 15, 2023**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Chief Justice Walker, dissenting, joined by Justice Wooton:

The Legislature has provided hospitals and health care providers with a substantial shield in the form of the Medical Professional Liability Act[1] and the peer review privilege at issue in this case. The majority opinion has taken that shield and cobbled a fortification wall at its edges to build a fortress surpassing even the bounds of the Legislature's sweeping protections. The majority opinion would prompt any reasonable lawyer to counsel hospitals to jam *any* adverse event that occurs within its walls into a document purported to "better healthcare," and filter it through a "review organization" thereby shielding non-patient care related facts from discovery. Because the majority has not applied the statute to these facts beyond blind deference to the circuit court that far exceeds both the scope of the statutory language and the purpose of the peer review privilege, I respectfully dissent.

The purpose of the peer review privilege is steadfast in protecting peer-to-peer examination of the performance of health care services: "The enactment of West Virginia Code §§ 30-3C-1 to -3 (1993) clearly evinces a public policy encouraging health care professionals to monitor the competency and professional conduct of their peers in

---

[1] W. Va. Code §§ 55-7B-1 to -12.

1

order to safeguard and improve the quality of *patient care*."[2] This Court explained the importance of professional self-evaluation in *Daily Gazette Co. v. West Virginia Board of Medicine*,

> One of the better discussions concerning the reason why state legislatures generally protect peer review proceedings from disclosure is contained in *Jenkins v. Wu*, 102 Ill.2d 468, 468 N.E.2d 1162 (1984). . . . [T]he Supreme Court of Illinois explained the purpose of peer review privilege legislation:
>
>> "[T]he purpose of this legislation is not to facilitate the prosecution of malpractice cases. Rather, its purpose is to ensure the effectiveness of professional self-evaluation, by members of the medical profession, in the interest of improving the quality of health care. The Act is premised on the belief that, absent the statutory peer-review privilege, physicians would be reluctant to sit on peer-review committees and engage in frank evaluations of their colleagues." 102 Ill.2d at 479-80, 468 N.E.2d at 116-69.[3]

In discussing the "chilling effect" of disclosing documents that *are* properly within the peer review privilege, we have recognized that "[t]he enactment of the peer review statutes represents a legislative realization that self-policing within the medical community is vital."[4] And,

> Doctors are motivated to engage in strict peer review by the desire to maintain the patient's well-being and to establish a

---

[2] Syl. Pt. 2, *Young v. Saldanha*, 189 W. Va. 330, 431 S.E.2d 669 (1993) (emphasis added).

[3] 177 W. Va. 316, 322, 352 S.E.2d 66, 72 (1986).

[4] *Saldanha*, 189 W. Va. at 335, 431 S.E.2d at 674.

highly respected name for both the hospital and the practitioner within the public and professional communities. However, doctors seem to be reluctant to engage in strict peer review due to a number of apprehensions: loss of referrals, respect, and friends, possible retaliations, vulnerability to torts, and fear of malpractice actions in which the records of the peer review proceedings might be used.[5]

Using the purpose of the peer review statute as a backdrop, the peer review privilege is established at West Virginia Code § 30-3C-3. It provides in pertinent part that "[t]he proceedings and records of a review organization shall be confidential and privileged and shall not be subject to subpoena or discovery proceedings or be admitted as evidence in any civil action arising out of the matters which are subject to evaluation and review by such organization[.]"[6] But, information, documents, or records otherwise available from original sources are not immune from discovery "merely because they were presented during proceedings of such organization[.]"[7]

---

[5] *Id.* (quoting Gregory G. Gosfield, *Medical Peer Review Protection in the Health Care Industry*, 52 Temp.L.Q. 552, 558 (1979)).

[6] W. Va. Code § 30-3C-3 (1980). Insofar as I am concerned in this dissent with documentary evidence (i.e., the incident report), it is unnecessary to include the testimonial privileges the statute extends to peer review organizations as well. Suffice it to say that I disagree with the majority that the failure to object to Cornerstone's motion in limine to exclude references to privileged material constitutes a waiver when that motion in limine, at most, is a redundancy of matters already decided by the circuit court in finding the incident report privileged in the first place.

[7] *Id.*

3

To establish application of the privilege, the incident report must be a record of a review organization. A review organization is defined as

> "any committee or organization engaging in peer review . . . , *to gather and review information relating to the care and treatment of patients* for the purposes of: (i) Evaluating and improving the quality of health care rendered; (ii) reducing morbidity or mortality; or (iii) establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care."[8]

"Peer review," in turn, means the procedure for evaluation by health care professionals *of the quality and efficiency of services ordered or performed by other health care professionals*, including practice analysis, inpatient hospital and extended care facility utilization review, medical audit, ambulatory care review, claims review and patient safety review.[9]

The majority rests its conclusion that the peer review privilege was properly applied to the incident report below because nothing in the statute specifically *excludes* non-patient documents from the protections of the peer review privilege, but does nothing to analyze how the incident report otherwise meets the criteria that *is* included in the statutory framework. In apparent deference to the circuit court's legal conclusions, the

---

[8] W. Va. Code § 30-3C-1 (1980) (emphasis added). The ellipses removes a non-exclusive list of committees or organizations for ease of reference.

[9] *Id.*

4

majority has failed to apply the statute to these facts and reaches a result that distorts both the scope and purpose of the peer review privilege.

As noted by the majority,

"[t]o determine whether a particular document is protected by the peer review privilege codified at W. Va. Code § 30-3C-3 (1980) (Repl. Vol. 2015), a reviewing court must ascertain both the exact origin and the specific use of the document in question. *Documents that have been created exclusively by or for a review organization*, or that originate therein, and that are used *solely by that entity* in the peer review process are privileged. However, documents that either (1) *are not created exclusively by or for a review organization*, (2) originate outside the peer review process, or (3) are used outside the peer review process are not privileged."[10]

Applying the statutory definitions to the factual scenario below, the incident report must have been "peer review" material created exclusively by or for a "review organization" and both of those definitions involve health care. A review organization is convened to gather and review information relating to the care and treatment of patients. Similarly, peer review is an evaluation of the quality and efficiency of services ordered or performed by other health care professionals. As a health care professional cannot order or perform services on a non-patient so as to meet the definition of "peer review," and the definition of "review organization" outright provides that those organizations review the care and

---

[10] Syl. Pt. 1, *State ex rel. Wheeling Hospital, Inc. v. Wilson*, 236 W. Va. 560, 782 S.E.2d 622 (2016) (emphasis added).

5

treatment of *patients*, I disagree with the majority's analysis that the peer review privilege may be properly applied to documents relative to a non-patient.[11]

If we assume that the majority has concluded the peer review privilege applies because the presence of nursing tape in a patient room that (allegedly) affected a non-patient visitor could have some non-realized impact on patient care, it necessarily relies on the breadth of the statute. But the breadth of a statute does not mean it is an endless chasm into which every factual scenario fits; this statute has parameters. Had the Legislature wanted to say that a hospital[12] can generate *any* document and protect it from discovery by merely asserting that an incident occurred in the hospital, it would have said so. Instead, it kept with the purpose of the peer review privilege – that is, peer-to-peer review. Peers (health care professionals) review the "quality and efficiency of services ordered or performed" by their peers (other health care professionals). But even if we accept the majority's broad view of "care and treatment of patients" and the "quality and efficiency of services ordered or performed by other healthcare professionals" the facts of this case cannot support application of the peer review privilege because this document *cannot* have been generated for that purpose.

---

[11] *See also supra* n.2, citing Syl. Pt. 2, *Saldanha* ("The enactment of West Virginia Code §§ 30-3C-1 to -3 (1993) clearly evinces a public policy encouraging health care professionals to monitor the competency and professional conduct of their peers in order to safeguard and improve the quality of *patient care*.") (emphasis added).

[12] *See infra* n.21.

Here, let's assume that plaintiff's version of events is true; that he told the nurses who responded to his fall that he tripped on nursing tape. If the peer review privilege may be extended to documents involving a non-patient and we take a broad view of the statutes in play, one could conclude that documents generated in response to that fall could impact patient care. Under that scenario, the nursing tape was left in a patient's room – if a peer review organization reviews that nursing tape was left there, it can implement a policy requiring the nurse to make a sweep of the room for obstructions near the patient's bed to prevent *patient* falls.[13]

But those aren't the facts the hospital pleads. The facts (according to the hospital) are that there was *never* any nursing tape left in the room and that Mr. Toler never said a word to anyone about nursing tape until he filed his civil action. The testimony of the nurses was that Mr. Toler's legs gave out. What possible reason for improving healthcare could Nurse Hall have had when generating that incident report when the unequivocal testimony was that Mr. Toler (a non-patient) fell of his own accord? The peer review privilege invoked below was premised on the argument that *allegations in the civil action* involved healthcare.

---

[13] This assumes, of course, that the presence of tape in the floor is a health care professional function and not a housekeeping function.

That is an after-the-fact justification for generation of the report when application of the privilege evaluates in-time state of mind: "[i]t goes without saying that documents using data that is *generated exclusively for* or by a peer review organization for its sole use are protected by the peer review privilege."[14] We underscored by syllabus point that the document must be "*created* exclusively by or for a review organization"[15] and that "the origin of the document determines if it is privileged."[16] Even under a broad view of the statute, an unsafe patient room (by virtue of nursing tape on the floor) cannot transform this incident report into patient care for purposes of the peer review privilege because the hospital maintains no such unsafe environment ever existed. In other words, the incident report at issue here cannot have been created for the purpose of improving healthcare when no specter of healthcare was being performed. For that reason, even if the peer review

---

[14] *Wheeling Hosp.*, 236 W. Va. at 570, 782 S.E.2d at 632 (emphasis added).

[15] *Id.* at Syl. Pt. 1 (emphasis added). This syllabus point took the *recommendation* in *State ex rel. Shroades v Henry*, 187 W. Va. 723, 729, 421 S.E.2d 264, 270 (1992) – "When discovery is sought by identifying existing documents or of documents held by a non-review organization, the party claiming the document is privileged should identify the document by name, date, custodian, source *and reason for creation*[]" – and crafted a syllabus point relative to analyzing the peer review privilege. The "reason for creation" element is incorporated into the portion of the syllabus point reiterating that the analysis of the privilege includes ascertaining the origin of the document and its use by the review organization. *See Wheeling Hosp.*, 236 W. Va. at 574, 782 S.E.2d at 636.

The 2019 amendments further clarify that the peer review privilege attaches to documents "prepared by or on behalf of a health care provider *for the purpose of* improving the quality, delivery, or efficiency of health care . . . .". W. Va. Code § 30-3C-3(a) (2019) (emphasis added).

[16] *Wheeling Hosp.*, 236 W. Va. at 570, 782 S.E.2d 632 (quoting *Shroades*, 187 W. Va. at 728, 421 S.E.2d at 269).

8

privilege may be extended to documents involving non-patients under the guise that "patient care" may be obliquely affected, I disagree that the privilege may be applied under these facts to preclude disclosure of the incident report to Mr. Toler.[17]

In affirming the circuit court's conclusion that this document was privileged, the majority has set a disturbing precedent that anything that occurs in a hospital may hypothetically affect patient care and, for that reason alone, suffices to meet the definitional requirements of asserting the peer review privilege without actually applying those definitional requirements. Specifically, the majority defers to the circuit court's findings[18] that (1) the incident report was prepared by a nurse and reviewed by the Director of Quality Management[19] and (2) the incident report was generated to report a non-routine event that

---

[17] Because the incident report remains privileged by majority vote, I am unable to conduct the harmless error analysis as suggested by Cornerstone.

[18] I disagree that the circuit court's application of the peer review privilege is subject only to abuse of discretion review insofar as it involves application of a statute.

[19] The 2019 amendment broadened the definition of "review organization" to include individuals, but the version of the statute applied in this case does not. As discussed in *Shroades*, the first question in the analysis of the peer review privilege is from whom the disclosure is sought (i.e., is there a review organization that fits the statutory definition) and, if the document did not originate there, where it originated. *Shroades*, 187 W. Va. at 728-29, 421 S.E.2d at 269-270.

The makeup of the "review organization" purportedly convened to review Mr. Toler's fall is not sufficiently described by Cornerstone, and Mr. Toler has not argued the original source exception. Because the record does nothing to cure the confusion, I am without sufficient information to evaluate whether it applies here. It bears mentioning, however, that in *Wheeling Hospital*, this Court specifically cautioned that

9

had some potential for injury to a patient or visitor and for that reason it was generated with the intent to ensure quality health care was rendered at the hospital.

Notably absent from the majority's analysis is an evaluation of what "patient care" was being evaluated by this review organization and how this incident report was used to ensure quality health care. As noted above, based on the facts put forth by Cornerstone, that evaluation does not lead back to "patient care." In that sense, reliance on the circuit court's findings, which are little more than broad generalizations about non-routine events, is much more problematic than the fact-specific inquiry that analysis of an asserted privilege should be.[20] It creates a rule that non-routine events that occur "in the facility" are subject an assertion of the peer review privilege because that "facility" is a hospital and patient care is going on *somewhere*.

---

"[d]ocuments that may be provided to a peer review committee, but were not originally prepared exclusively for the committee and are also accessible to staff of the facility in their capacities as employees or managers of the facility, separate and apart from any role on a review committee, are not in any way protected by the privilege."

236 W. Va. at 572, 782 S.E.2d at 634 (quoting *Large v. Heartland-Lansing of Bridgeport Ohio, LLC*, 995 N.E.2d 872-884-85 (Ohio Ct. App. 2013) (citations omitted)).

[20] *See* Syl. Pt. 2, *Shroades*, 187 W. Va. 723, 421 S.E.2d 264 (1992) ("The determination of which materials are privileged under W. Va. Code 30-3C-1[1975] *et seq.* is essentially a factual question and the party asserting the privilege has the burden of demonstrating that the privilege applies."). As discussed above, I take issue with the "facts" as asserted by hospital in support of this privilege – that the incident report was generated to prevent future falls on nursing tape that they maintain was never there to begin with.

10

Under the 1980 version of the peer review statute, the "peer" in "peer review" is another *individual* health care professional[21] -- not a health care facility.[22] But the majority writes out "peer" and "review" from consideration when extending the protection to what amounts to a business record under these facts. In extending the peer review privilege to this incident report merely because it documents a non-routine event happening in a hospital where there are patients, visitors, and employees who might be injured, the majority takes a leap outside the scope of the statutory language and the purpose of the peer review privilege.

A good question to ask in determining whether the peer review privilege should apply is, "what would the hospital or health care professional have *fixed* on these facts?" Would it have fixed any healthcare service? If there is a slip-and-fall on water in the waiting room (which, according to Cornerstone would have prompted the generation of an incident report) is there a call made to a healthcare provider? Or is the call made to maintenance? If a visitor gets food poisoning in the hospital cafeteria (a non-routine event that would have prompted generation of an incident report), is a peer review organization

---

[21] *See* W. Va. Code § 30-3C-1 (defining health care professionals).

[22] The 2019 amendments change the term to "health care provider" and that term includes "a person, partnership, corporation, professional limited liability company, health care facility, entity or institution licensed by, or certified in, this state or another state, to provide health care or professional health care services . . . ."

11

called upon to engage in critical thinking of how it can provide better healthcare by making better sandwiches? Or is that a nutrition services problem? What about issues in the gift shop – is it "patient care" since patients could hypothetically go there?

The majority, in casting so wide a net, ignores that a hospital is not always, under all fact patterns, providing a healthcare service simply because it is a hospital. And, under the majority's interpretation of this statute, anything that happens in a hospital is healthcare and is protected from disclosure in any type of civil action under the peer review privilege, *regardless* of the circumstances that prompted generation of the incident report.

The peer review privilege has a valid and important purpose because we *want* our hospitals and healthcare providers to take a critical view of the healthcare services offered and performed. Many, many documents are properly shielded from discovery in the name of incentivizing health care providers to be and do better. But insulating this document from discovery does not serve that purpose – it insulates the hospital as a *business* not a provider of healthcare. We would scoff at the idea of allowing a hotel or grocery store to protect information related to a slip-and-fall but in every sense, this is exactly what the majority opinion does. Protecting slip-and-fall factual information from discovery because it occurred within the four walls of a hospital (or even in its parking garage) is contrary to the purpose and intent of the peer review privilege when there is no patient care or health care professional involved in that slip-and-fall.

12

The burden to prove the applicability of the peer review privilege was on Cornerstone and it simply didn't meet it.[23] In alleviating Cornerstone of that burden, the majority does not apply the statute, but instead defers to the circuit court's findings that conflate what the document *could* have been used for with the purpose for which it was actually created. That conflation, in turn, will affect future cases because hospitals will funnel facts related to every non-routine event into a peer review organization and the majority opinion will give it blanket protection for no other reason than that it happened in a hospital. Because I find this is a perversion of the purpose of the peer review privilege and a distortion of the statutory language effectuating that laudable purpose, I dissent. I am authorized to state that Justice Wooton joins in this dissent.

---

[23] *See supra* n.20. *Accord*, Syl. Pt. 3, *Wheeling Hosp.*, ("The party seeking the protections of the peer review privilege bears the burden of establishing its applicability by more than a mere assertion of privilege.").